E-FILED
Wednesday, 15 January, 2020  03:39:49 PM
Clerk, U.S. District Court, ILCD

AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

### for the

### Central District of Illinois



In the Matter of the Search of

*(Briefly describe the property to be searched
or identify the person by name and address)*

Information associated with username
kjfang3@gmail.com further described in Attachment A
which is attached hereto and incorporated herein

)
)
)
)
)
)

Case No. 20-MJ- 7004

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

Information associated with username kjfang3@gmail.com further described in Attachment A which is attached hereto and incorporated herein

located in the ___Northern___ District of ___California___, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | | Offense Description |
|---|---|---|
| 18 U.S.C. § 1001 | False statements | |

The application is based on these facts:

See attached affidavit.

☐ Continued on the attached sheet.

☑ Delayed notice of __30__ days (give exact ending date if more than 30 days: _____ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

s/Stephen M. Dalecheck

*Applicant's signature*

Stephen  M. Dalechek, Special Agent FBI

*Printed name and title*

Sworn to before me and signed in my presence.

s/Eric I. Long

Date: ___1/15/2020___

*Judge's signature*

City and state:  Urbana, Illinois

Eric I. Long

*Printed name and title*

## AFFIDAVIT

I, Stephen M. Dalechek, being first duly sworn, hereby depose and state as follows:

### Introduction and Agent Background

1.      I am a Special Agent with the Federal Bureau of Investigation and have reason to believe that on the property or premises known as Google, Inc., an email provider headquartered at 1600 Amphitheatre Parkway, Mountain View, CA 94043, there is now concealed certain information associated with the username **kjfang3@gmail.com**, which is information that constitutes evidence of the commission of a criminal offense; and/or contraband, fruits of crime and things otherwise criminally processed as well as property designed and intended for use, and that has been used, as a means of committing the criminal offenses of violation of Title 18, United States Code, Section 1001 (Statements or entries generally).

2.      I make this affidavit in support of an application for a search warrant for information associated with certain accounts that is stored at premises owned, maintained, controlled, or operated by Google Inc., an email provider headquartered at 1600 Amphitheatre Parkway, Mountain View, CA 94043.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Google to disclose to the government records

and other information in its possession pertaining to the subscriber or customer associated with the accounts, including the contents of communications.

3.      I am a Special Agent with the Federal Bureau of Investigation and have been have been so employed since 2016. I am currently assigned to the Springfield Division of the FBI. In this capacity, I am charged with investigating possible violations of federal criminal law. By virtue of my employment with the FBI, I perform and have performed a variety of investigative tasks, including functioning as a case agent on criminal and national security cases. I have received training on how to conduct criminal and national security investigations. I have also received training and gained experience in interviewing and interrogation techniques, the execution of federal search warrants, seizures, and the identification and collection of computer-related evidence. In addition, I have personally participated in numerous executions of federal search warrants involving the search and seizure of computer equipment.

4.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 1001 (Statements or entries generally) have been committed by **FANG** utilizing **kjfang3@gmail.com**. There is also probable cause to search the information described

2

in Attachment A for evidence of these crimes and contraband or fruits of these crimes,

as described in Attachment B.

## Statutory Authority

6.     Pursuant to Title 18, United States Code, Section 1001, Statements or

entries generally.

>     Whoever, in any matter within the jurisdiction of the executive,
>     legislative, or judicial branch of the Government of the United States,
>     knowingly and willfully –
>
>     (1) Falsifies, conceals, or covers up by any trick, scheme, or device a
>         material fact;
>
>     (2) Makes any materially false, fictitious, or fraudulent statement or
>         representation; or
>
>     (3) Makes or uses any false writing or document knowing the same
>         to contain any materially false, fictitious, or fraudulent statement
>         or entry.

## Probable Cause

7.     The United States is investigating an allegation that **KEJIE FANG**

(hereinafter "**FANG**"), who resides at 2210 Edgewater Place, Champaign, Illinois 61822,

is coordinating, facilitating, and benefiting from a violation of false statements by

utilizing the platform **kjfang3@gmail.com.** The investigation concerns possible

violations of 18 U.S.C. § 1001 (Statements or entries generally).

8.     **FANG** is an Assistant Professor, Department of Electrical and Computer

Engineering at the University of Illinois at Urbana-Champaign (UIUC). **FANG** has been

employed in this position since 2017. His research lies in the field of nanophotonics,

3

optomechanics, quantum photonics, physics explorations, and chip-scale integration. Through the study of light and light-matter interaction at micro-sales and nano-scales, they seek new insights in photonics to address emerging technology challenges from manipulation of single photons to large scale integration. As an Assistant Professor at UIUC, **FANG** is an employee of UIUC, and able to act on behalf of the organization to receive federal funds.

9.      On December 30, 2016, **FANG** was accepted into the Thousand Talent Program and was offered a position at Shanghai Jiaotong University.

10.     From 2013 through 2017, **FANG** was a Senior Research Scientist in the Department of Applied Physics at California Institute of Technology. On December 17, 2018, the California Institute of Technology provided email transactional records related to **FANG** at email address kfang84@caltech.edu from May 24, 2017, through November 30, 2018. The California Institute of Technology advised that the email address kfang84@caltech.edu was deleted on May 14, 2018. However, **FANG** had an automatic email forwarding rule from kfang84@caltech.edu to **kfang3@gmail.com.**

11.     The transactional records show kfang84@caltech.edu continued to receive emails until the end of the request on November 30, 2018. The emails sent to the deleted account kfang84@caltech.edu would be automatically forwarded to **kfang3@gmail.com,** providing **FANG** access to the email account after California Institute of Technology deleted the account.

4

12.     According to California Institute of Technology transactional records, on September 19, 2017, and September 30, 2018, **FANG,** at kfang84@caltech.edu, received an email from rgov-bounce@nsf.gov. The nsf.gov email domain is operated by the National Science Foundation.

13.     On September 22, 2017, **FANG** at kfang84@caltech.edu received an email from xiejunxia@usetc.edu.cn. The @usetc.edu.cn email domain is operated by University of Electronic Science and Technology of China (USETC). USETC is a national university operated directly under the Ministry of Education of China.

14.     On July 15, 2018, and September 30, 2018, **FANG,** at kfang84@caltech.edu, received an email from @cio.gov. The cio.gov email domain is operated by the CIO Council, a U. S. Federal Government website.

15.     On June 6, 2017, December 8, 2017, January 16, 2018, February 10, 2018, March 4, 2018, and October 21, 2018, **FANG,** at kfang84@caltech.edu, received an email from piers@emwave.cn. The piers@emwave.cn email domain is operated in China.

16.     On February 28, 2018, **FANG,** at kfang84@caltech.edu, received an email from zehuanglu@hust.edu.cn. The @hust.edu.cn email domain is operated by Huazhong University of Science and Technology, China.

17.     **FANG**, who is a Legal Permanent Resident, is a participant in the Thousand Talent Program (TTP). The TTP is a prominent Chinese national talent recruitment program. The TTP's goal is to procure knowledge and Intellectual Property (IP) from foreign countries to support China's rise as a world power. TTPs "goal is to

recruit ethnic Chinese experts from Western Universities, research centers, and private

companies to boost China's national capabilities in the science and technology fields

and to move China forward as an innovation nation. The program also implemented

sub-programs for both young and foreign (non-ethnic Chinese) experts." "The threat

not only targets business or universities but potentially targets the researchers or

scientists themselves. The technology researched or developed not only costs millions of

dollars but costs years, if not decades, to develop." "Chinese Talent Program pose a

serious threat to US Businesses and universities through economic espionage and theft

of IP…. One of the greatest threats from these experts is transferring or transporting

proprietary, classified, or export-controlled information, or IP, which can lead to

criminal charges."[1]

     18.    Through the TTP, China has leveraged researchers, academics, and U.S.

government employees to gain access to information they would otherwise not be able

to freely acquire, and they have done so openly, not covertly. China has successfully

used the TTP to exploit the gray area between basic research and applied research, co-

opting and obtaining significant technologies. This, in turn, has allowed China to skip

generations of basic research. China has quite adeptly exploited our open society, and

has damaged U.S. economic and national security interests in the process. By forcing

TTP Recruits to draw upon the results of their foreign research to be successful in the

Talent Plans, China has co-opted the U.S. research and development machine and has

---

[1] FBI Counterintelligence Strategic Partnership Intelligence Whitepaper 15-007.

successfully re-purposed hundreds of millions of dollars of U.S. grant funds. The FBI identified what appears to be significant misuse of U.S. government funding by TTP Recruits, primarily through grants or contracts related to basic research. TTP Recruits often become part of a Chinese government TTP on the basis of research funded by the U.S. government. These Recruits then frequently use the results of their U.S. research to accelerate or amplify projects funded by the government of China.

19.     TTP recruits sign contracts covering their participation in the TTP. These contracts obligate them to work for a specified period of time in China, and often detail the specific research the TTP Recruit will perform. This contractual obligation closely resembles or even replicates the work the TTP Recruit performs for his U.S. employer, thus demonstrating his willingness to leverage knowledge and intellectual property obtain from U.S. academic universities. This contractual relationship differentiates TTP from standard scientific research grants or conventional international collaboration. Rather than conducting scientific research, TTP recruits are contractually obligated to perform services for China in support of its strategic national development goals and economic revitalization.

20.     One of the U.S. Government grant programs the TTP exploits is through the National Science Foundation (NSF.) This exploitation has previously been identified by the FBI. The National Science Foundation (NSF) is an "independent federal agency created by Congress in 1950 under Public Law 81-507, in order "to promote the progress of science; to advance the national health, prosperity, and welfare; to secure the national

defense..." NSF is vital because it supports basic research and people to create knowledge that transforms the future. This type of support is the primary driver of the U.S. economy, enhances the nation's security, and advances knowledge to sustain global leadership. As described in the strategic plan, NSF is the only federal agency whose mission includes support for all fields of fundamental science and engineering, except for medical sciences. It is tasked with keeping the United States at the leading edge of discovery in areas from astronomy to geology to zoology. In addition to funding research in the traditional academic areas, the agency also supports "high-risk, high pay-off" ideas, novel collaborations and numerous projects that may seem like science fiction today, but which the public will take for granted tomorrow. And in every case, NSF ensures that research is fully integrated with education so that today's revolutionary work will also be training tomorrow's top scientists and engineers." [2]

21.     The NSF is aware its research grants are utilized by the TTP in order to exploit its open exchange of ideas and information. On October 23, 2018, Diane L. Souvaine, Chair of the NSF released a statement from the National Science Board on Security and Science. In the statement, she highlighted that "as partners in the scientific enterprise, U.S. universities and colleges must help promote scientific openness and integrity and safeguard information that impacts national security and economic competitiveness. The NSB recommends that all institutions conducting fundamental research supported by the NSF embrace transparency and rigorously adhere to conflict

---

[2] Https//www.nsf.gov/about

of interest and conflict of commitment policies." [3] The NSF requires all senior project personnel included in any grant application to provide a biographical sketch, list all current and pending support, and to disclose all information regarding collaborators and other affiliations on the Collaborators and Other Affiliations (COA) Information Template.

22.     As a Legal Permanent Resident and Assistant Professor at UIUC, **FANG** is able to apply for U.S. grants through the NSF. The NSF conducted a review for awarded grants for **FANG**. On March 14, 2019, NSF provided the results for **FANG**, who received two grants through UIUC as either Principal Investigator or co-Principal Investigator, NSF Award Number 1839177, and NSF Award Number 1809707. In both applications, **FANG** did not disclose his participation in the TTP, on the application or on the COA Information Template.

23.     NSF provided the results for **FANG**, who has two additional grant applications, which have been declined or are currently pending review at NSF, NSF Number 1936377 and NSF Number 1944728. On May 25, 2019, **FANG**, through UIUC, submitted NSF Number 1936377. On July 18, 2019, **FANG**, through UIUC, submitted NSF Number 1944728. In both applications, **FANG** did not disclose his participation in the TTP, and did not reference his collaboration with Zhejiang University, China, in either the application or on the Collaborators and Other Affiliations (COA) Information Template.

---

[3] NSB-2018-52

24.     When NSF approves a federal grant to fund research, NSF notifies the institution in receipt of the grant. NSF provides the institution the funds for the grant. The institution is responsible for distributing the funds to the researcher, and ensuring the funds are utilized in accordance with the Research Terms and Conditions.

25.     On July 31, 2019, UIUC provided the records for **FANG's** report of Non-University Activities (RNUA.) The records request ranged from January 1, 2016, through June 19, 2019. **FANG** disclosed one RNUA within UIUC Electrical and Engineering department, dated November 6, 2017. The RNUA did not disclose "Outside Activity."

26.     On July 24, 2018, NSF notified the Board of Trustees of UIUC that they were awarded a grant of $360,114 for NSF Award Number 1809707. The grant was awarded pursuant to the authority of the National Science Foundation Act of 1950, as amended (42 U.S.C. §§ 1861-75) and is subject to Research Terms and Conditions dated March 14, 2017, and NSF Agency Specific Requirements, dated May 14, 2018. **FANG** submitted the NSF proposal through UIUC in order to receive grant funding to research Cavity-Electro-Optomechanical Circuits with Broken Time-Reversal Symmetry. The award started August 1, 2018, and ends July 31, 2021. The grant funds were distributed to **FANG**, utilizing UIUC as a medium to receive grant funding.

27.     On September 11, 2018, NSF notified the Board of Trustees of UIUC that they were awarded a grant of $999,999 for NSF Award Number 1839177. The grant is awarded pursuant to the authority of the National Science Foundation Act of 1950, as

10

amended (42 U.S.C. §§ 1861-75) and is subject to Research Terms and Conditions dated
March 14, 2017, and NSF Agency Specific Requirements, dated May 14, 2018. This
research project was in collaboration with other researchers to include **FANG**. **FANG**
and other researchers submitted the NSF proposal through UIUC in order to receive
grant funding to research RAISE-TAQS: Enhancing classical and quantum information
capacities with imperfect resources: Experimental implementations and theoretical
bounds. The award started September 15, 2018, and ends August 31, 2022. The grant
funds were distributed to **FANG** and other researchers, utilizing UIUC as a medium to
receive grant funding.

28.     Within the NSF proposal, the grant allocated funds for researchers to
purchase equipment utilizing NSF grant funds. **FANG** requested and received a quote
from Newport Corporation for a "TLB-6728-P; Turnable laser with integrated AR
coated laserdiode" for approximately $34,029.49. **FANG** provided his contact
information as UIUC, 208 North Wright Street, Urbana, IL, telephone number (650) 450-
6998, and email address **kjfang3@gmail.com**.

29.     On March 18, 2019, a U. S. Department of Commerce federal agent
contacted Newport Corporation to inquire about "TLB-6728-P." Newport Corporation
stated "TLB-6728-P" was marked "EAR99" in regards to export control, as recognized
by the U.S. Department of Commerce.

30.     The U.S. Department of Commerce recognizes items "EAR99" as falling
under their jurisdiction, but does not require a license to export the item. With the

11

exception that an item labeled "EAR99," cannot be exported without a licensees to an embargo, or sanctioned country, to a party of concern, or in support of a prohibited end use. A party of concern includes the entity list that identifies foreign parties that are prohibited from receiving some or all items subject to the Export Administration Regulation (EAR) unless the exporter secures a license. These parties present a greater risk of diversion to weapons of mass destruction (WMD) programs, terrorism, or other activities contrary to U.S. national security and/or foreign policy interests. By publicly listing such parties, the Entity List is an important tool to prevent unauthorized trade in items subject to the EAR. In most instances, license exceptions are unavailable for the export, re-export, or transfer (in-country) to a party on the Entity List as appears in Section 744, Supplement 4.

31.     On April 26, 2019, a search warrant was issued in the United States District for the Central District of Illinois to UIUC for the email account kfang3@illinois.edu.  The transactional records identified that kfang3@illinois.edu is registered to **FANG**, an Assistant Professor at UIUC. The following emails transactions were identified.

32.     On January 1, 2018, **FANG**, at kfang3@illinois.edu. received an email from Tout Want at tout.wang@mlasers.com**.** In the email, Tout Wang inquired about **FANG** "moving to Shanghai Jiaotong University to start a group."

33.     On November 14, 2018, **FANG**, at kfang3@illinois.edu sent an email to zc.ruan@gmail.com. In the email, **FANG** states "After the job search, I am now in UIUC

ECE since this year. As you know, there is a joint institute between ZJU and UIUC, and collaboration between the two institutions is growing. Recently, there is a call for proposal on UIUC campus, to seek collaborations between ZJU and UIUC faculty. I immediately think of you. If you are interested, maybe we should have a call and I can tell you more about potential projects. The deadline is Dec. 5th."

34.    On November 14, 2018, zc.ruan@gmail.com sent an email to **FANG** kfang3@illinois.edu. In the email, Zhichao states, "it is quite nice to hear from you. Sure, it is so great if we can work together for a proposal."

35.    On November 14, 2018, **FANG,** at kfang3@illinois.edu sent an email to zc.ruan@gmail.com. In the email, **FANG** provides the announcement for ZJU-UIUC Institute Research and Program.

36.    The announcement **FANG** referenced was in regards to ZJU-UIUC Institute Research and Program. In the announcement, it explained the ZJU-UIUC Institute was established "In 2015, the University of Illinois at Urbana-Champaign and the College of Engineering (COE) accepted an invitation from Zhejiang University to form a joint engineering institute. The institute is located on the new ZJU International Campus in Haining, China, 35 miles northeast of Hangzhou and 90 miles southwest of Shanghai.

37.    On November 13, 2018, **FANG**, at kfang3@illinois.edu sent an email to zc.ruan@gmail.com. In the email, **FANG** stated "attached are the 3-page proposal and

template letter of interest. Could you add the institute header and your self introduction in the letter?"

38.  On November 23, 2018, zc.ruan@gmail.com sent an email to **FANG** kfang3@illinois.edu. In the email, Zhichao stated, "The proposal is great and I am very interested at the nonreciprocity on silicon circuits. We can discuss the detail later. Also as I have asked before, we would like to invite you to visit here and give us more educative talk. Attached please find the signed letter." In the email, Zhichao attached a "Letter of Collaboration interest(signed).pdf." In the attached PDF, Zhichao identified himself as a professor at the Department of Physics in Zhejiang University, Hangzhou, China. Zhichao stated "This letter is written to confirm my interest of collaboration with Dr. Kejie Fang in his proposed project "Optical nonreciprocity via parametric photon interaction." Zhichao also states; "To further facilitate the collaboration, I plan to host Dr. Fang for a visit to Zhejiang University during the project, and Dr. Fang will host a graduate student from my group as visiting research in the summer of 2019."

39.  On December 1, 2018, **FANG**, at kfang3@illinois.edu emailed Katherine Freemen at katefree@illinois.edu. In the email, **FANG** states "Attached please find our ZJUI research proposal."

40.  On March 29, 2019, Jennifer T. Bernhard at jbernhar@illinois.edu emailed **FANG**, at kfang3@illinois.edu with the subject line "Update on Zjui Collaborative Research Proposal Competition Status." In the email, Jennifer Bernhard explained "you should expect to hear definitively on the status of your proposal well before May 16th."

41.     On September 30, 2019, the FBI obtained records from University of Illinois Urbana - Champaign in regards to ZJU-UIUC Research Proposal.

42.     The records identified on December 1, 2018, that **FANG** submitted his proposal for the ZJUI research proposal.

43.     On July 19, 2019, Jennifer Bernard notified **FANG** at kfang3@illinois.edu, his ZJUI Research proposal was not accepted for support in the third round.

44.     The records identified **FANG** at kfang3@illinois.edu was listed as the Principal Investigator for UIUC. The record identified Zhichao Ruan was the Co-Principal Investigation at Zhejiang University, China.

45.     As previously mentioned, on May 25, 2019, **FANG**, through UIUC, submitted NSF Number 1936377. On July 18, 2019, **FANG**, through UIUC, submitted NSF Number 1944728. In both applications, **FANG** did not disclose his participation in the TTP, and did not reference his collaboration with Zhejiang University, China, in either the application or on the Collaborators and Other Affiliations (COA) Information Template.

46.     On June 19, 2019, U.S. Customs and Border Protection agents conducted an interview with **FANG** at O'Hare International Airport, Chicago, Illinois. **FANG** stated he was visiting his parents in Ningbo, China. **FANG** explain his research is funded by the National Science Foundation in the form of federal grants. **FANG** further elaborated that approximately two years ago, he was looking for a job in China. He went to "Shang Hai Jiao Tao University" and applied for a job. **FANG** also applied for

the Thousand Talent program. **FANG** stated if he was a member of this program
(Thousand Talent Program,) he would receive more funding and it is generally
considered "favorable" to be a member. **FANG** stated he never accepted a job offer in
China nor did he receive any funding to do research in China. **FANG** did admit to
being a member of the Thousand Talent Program. **FANG** provided the email address
**kfang3@gmail.com** as his point of contact.

### Background Concerning Email

47.     In my training and experience, I have learned that Google provides a
variety of on-line services, including electronic mail ("email") access, to the general
public.  Google allows subscribers to obtain email accounts at the domain name
illinois.edu like the email accounts listed in Attachment A.  Subscribers obtain an
account by registering with Google. During the registration process, Google asks
subscribers to provide basic personal information.  Therefore, the computers of Google
are likely to contain stored electronic communications (including retrieved and
unretrieved email for Google subscribers) and information concerning subscribers and
their use of Google services, such as account access information, email transaction
information, and account application information.

48.     In general, an email that is sent to a Google subscriber is stored in the
subscriber's "mail box" on Google servers until the subscriber deletes the email.  If the
subscriber does not delete the message, the message can remain on Google servers

16

indefinitely. Even if the subscriber deletes the email, it may continue to be available on Google servers for a certain period of time.

49.    When the subscriber sends an email, it is initiated at the user's computer, transferred via the Internet to Google servers, and then transmitted to its end destination. Google often saves a copy of the email sent. Unless the sender of the email specifically deletes the email from the Google server, the email can remain on the system indefinitely. Even if the sender deletes the email, it may continue to be available on Google servers for a certain period of time.

50.    A sent or received email typically includes the content of the message, source and destination addresses, the date and time at which the email was sent, and the size and length of the email. If an email user writes a draft message but does not send it, that message may also be saved by Google but may not include all of these categories of data.

51.    A Google subscriber can also store files, including emails, address books, contact or buddy lists, calendar data, pictures, and other files, on servers maintained and/or owned by Google.

52.    Subscribers to Google might not store on their home computers copies of the emails stored in their Google account. This is particularly true when they access their Google account through the web, or if they do not wish to maintain particular emails or files in their residence.

17

53.    In general, email providers like Google ask each of their subscribers to provide certain personal identifying information when registering for an email account. This information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number).

54.    Email providers typically retain certain transactional information about the creation and use of each account on their systems.  This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via Google's website), and other log files that reflect usage of the account.  In addition, email providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

55.    In some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  Email providers typically retain records about such communications, including records of contacts between the user and

the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

56.     In my training and experience, evidence of who was using an email account may be found in address books, contact or buddy lists, email in the account, and attachments to emails, including pictures and files.

## Information To Be Searched And Things To Be Seized

57.     I anticipate executing this warrant under the Electronic Communications Privacy Act or Stored Communications Act ("SCA"), in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Google to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

58.     Section 2703 of the SCA sets forth the procedure that federal and state law enforcement officers must follow to compel disclosure of various categories of stored records from electronic communication service providers. Wireless communications service providers as described above are electronic communication service providers as defined in 18 U.S.C. § 2510(15) because they "provide to users thereof the ability to send or receive wire or electronic communications."

59.     As shown from the following provisions of Section 2703, the government may compel disclosure of all stored content and records or other information pertaining

19

to a customer or subscriber of an electronic communication service or remote computer

service pursuant to a warrant issued using the procedures described in the Federal

Rules of Criminal Procedure.

      a.  Title 18, United States Code, Section 2703(a) provides, in part:

> A governmental entity may require the disclosure by a provider of
> electronic communication service of the contents of a wire or
> electronic communication, that is in electronic storage in an
> electronic communications system for one hundred and eighty days
> or less, only pursuant to a warrant issued using the procedures
> described in the Federal Rules of Criminal Procedure by a court with
> jurisdiction over the offense under investigation or equivalent State
> warrant. A governmental entity may require the disclosure by a
> provider of electronic communications services of the contents of a
> wire or electronic communication that has been in electronic storage
> in an electronic communications system for more than one hundred
> and eighty days by the means available under subsection (b) of this
> section.

      b.    Title 18, United States Code, Section 2703(b) provides, in part:

> (1) A governmental entity may require a provider of remote
> computing service to disclose the contents of any wire or electronic
> communication to which this paragraph is made applicable by
> paragraph (2) of this subsection -
>
>     (A) without required notice to the subscriber or customer, if
> the governmental entity obtains a warrant issued using the
> procedures described in the Federal Rules of Criminal Procedure by
> a court with jurisdiction over the offense under investigation or
> equivalent State warrant . . . .
>
> (2) Paragraph (1) is applicable with respect to any electronic
> communication that is held or maintained on that service –
>
>     (A) on behalf of, and received by means of electronic
> transmission from (or created by means of computer processing of
> communications received by means of electronic transmission from),
> a subscriber or customer of such remote computing service; and

(B) solely for the purpose of providing storage or computer processing services to such subscriber or customer, if the provider is not authorized to access the contents of any such communications for purposes of providing any services other than storage or computer processing.

c.  The government may also obtain records and other information pertaining to a subscriber to or customer of an electronic communication service or remote computing service by way of a search warrant. 18 U.S.C. § 2703(c)(1)(A). No notice to the subscriber or customer is required. 18 U.S.C. § 2703(c)(3).

## Conclusion

60.  Based on the forgoing, I request that the Court issue the proposed search warrant.

61.  This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is a district court of the United States for the Central District of Illinois that has jurisdiction over the offense being investigated.

## Request For Sealing

62.  I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good

cause to seal these documents because their premature disclosure may seriously

jeopardize that investigation.

                                        Respectfully submitted,
                                        s/Stephen M. Dalecheck


                                        Stephen M. Dalechek
                                        Special Agent
                                        Federal Bureau of Investigation

Subscribed and sworn to before me on
January 15, 2020.
    s/Eric I. Long


ERIC I. LONG
United States Magistrate Judge